Jack J. LOMBARDO, Plaintiff,

v.

John E. POTTER, Postmaster General, United States Postal Service, Defendant.

No. CIV.A. 02–2180CM.

United States District Court, D. Kansas.

Jan. 19, 2005.

Jack J. Lombardo, Overland Park, KS, pro se.

Steven D. Horak, Overland Park, KS, for Plaintiff.

Christina L. Medeiros, David D. Zimmerman, Christopher Allman, Office of United States Attorney, Kansas City, KS, for Defendant.

## MEMORANDUM AND ORDER

MURGUIA, District Judge.

Plaintiff brought this action *pro se* against defendant on April 23, 2002, claiming that defendant retaliated against him in violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e *et seq.* after plaintiff filed complaints against defendant. Plaintiff attached to his complaint two Equal Employment Opportunity Commission (EEOC) decisions that appealed defendant's final agency decisions on formal equal employment opportunity (EEO) complaints made by plaintiff on January 24, 1996, July 10, 1998 and September 1, 1998; and one final agency decision from defendant regarding a formal EEO complaint made by plaintiff on January 26, 2001. Plaintiff claims that the alleged retaliation created a hostile work environment.

This matter comes before the court on defendant's Motion to Dismiss or in the Alternative for Summary Judgment (Doc. 45). Also pending before the court is plaintiff's Motion to Supplement Summary Judgment Response (Doc. 57). For the reasons set forth below, plaintiff's Motion to Supplement Summary Judgment Response (Doc. 57) is granted, and defendant's Motion to Dismiss or in the Alternative for Summary Judgment (Doc. 45) is granted.

## I. Procedural Issues

### A. Consideration of Defendant's Motion to Dismiss or in the Alternative for Summary Judgment

Defendant has moved to dismiss a portion of plaintiff's claims pursuant to Fed.

R.Civ.P. 12(b)(1) and 12(b)(6). Alternatively, defendant has moved for summary judgment on all of plaintiff's claims. Because the parties have presented documents outside the pleadings for the court's consideration, and the court has considered those documents in making its ruling, defendant's motion shall be decided as a motion for summary judgment. Fed. R.Civ.P. 12(b).

### B. Plaintiff's Motion to Supplement Summary Judgment Response (Doc. 57)

■ On December 6, 2004, after the briefing of the Summary Judgment Motion was complete, plaintiff requested that he be allowed to supplement his response to the Summary Judgment Motion with an unsigned letter dated October 14, 2001, from plaintiff to the manager of EEO Dispute Resolution for defendant. Plaintiff contends that the letter demonstrates that plaintiff amended his complaint during the EEO process to add a complaint for wrongful termination or constructive discharge and further shows that he exhausted his administrative remedies on his constructive discharge claim.

Defendant opposes plaintiff's request to supplement his response, claiming that the document was not provided to defendant during discovery as a document supporting plaintiff's constructive discharge claim. Defendant points out that plaintiff testified during his March 9, 2004 deposition that he had not exhausted his administrative remedies on his constructive discharge claim, and that he did not tell anyone at the EEO office or any manager of defendant that he thought he was being constructively discharged at the time he retired. Defendant contends that it will be prejudiced if plaintiff is allowed to rely on this undisclosed document, which contradicts plaintiff's prior testimony, at this late stage in the litigation. Defendant further contends that the fact that plaintiff waited until defendant filed its summary judgment motion to produce and identify the exhibit, without any explanation or excuse, constitutes bad faith or willful failure to fully disclose evidence supporting plaintiff's claims. Defendant urges the court to exclude the supplemented evidence. However, defendant also acknowledges that it served a signed copy of the same letter to plaintiff in its Rule 26 disclosures that were served on September 23, 2003.

Because the substance of the letter is in the record and was disclosed during discovery, albeit by defendant, the court grants plaintiff's Motion to Supplement Summary Judgment Response (Doc. 57).

### C. Affidavits Submitted by the Parties

■ Both parties have submitted affidavits in support of their positions in the summary judgment briefing. Plaintiff contends that representatives of defendant have blatantly lied or misrepresented facts in their affidavits. It appears to the court that each of defendant's representatives who have submitted affidavits have testified as to their personal knowledge of the matters at issue in this case. Plaintiff has not shown that any of the affidavits from defendant's representatives present information that is contrary to any prior testimony or affidavits or that they attempt to create sham fact issues. *See Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986). In fact, the only deposition taken in this case was plaintiff's. Accordingly, the court finds that the affidavits submitted by defendant's representatives are admissible, and the court will consider them in making its ruling on the summary judgment motion.

■ Defendant contends that plaintiff's lengthy affidavit is replete with conclusory and unsupported allegations, as well as contradictions to his prior deposi-

tion testimony, that are not supported by reference to the record or which reference exhibits that were not attached to plaintiff's opposition brief. In determining whether to consider plaintiff's affidavit, the court notes that contradictions found in a witness's testimony are not, in themselves, sufficient to preclude consideration of such testimony. *Ralston v. Smith & Nephew Richards, Inc.,* 275 F.3d 965, 973 (10th Cir.2001). Indeed, "in determining whether a material issue of fact exists, an affidavit may not be disregarded [merely] because it conflicts with the affiant's prior sworn statements." *Franks,* 796 F.2d at 1237. However, in assessing a conflict under these circumstances, "courts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue." *Id.* Factors relevant to the existence of a sham fact issue include whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain. *Id.*

In this case, the court finds that plaintiff's affidavit, in several instances, directly contradicts his prior deposition testimony, conclusively alleges acts of retaliation that are not part of plaintiff's complaint, fails to establish personal knowledge to many of the facts attested, and fails to provide record support for many of the facts asserted. In more than one instance, an exhibit referenced in plaintiff's affidavit has not been provided to defendant or to the court. Plaintiff does not argue that the information contained in his lengthy affidavit is newly discovered evidence that was not available to him when defendant took his deposition or that would rectify confusion contained in his earlier testimony. Notably, plaintiff did not make any corrections or changes to the transcript of his deposition testimony.

■ Accordingly, the court disregards plaintiff's affidavit to the extent that it directly contradicts his prior deposition testimony without any record support, sets forth unsupported allegations and conclusions, and exceeds the scope of his claims in this case.

## II. Facts [1]

### A. Plaintiff's Career with Defendant

Defendant the United States Postal Service (USPS) is an independent establishment of the government of the United States. Plaintiff is a white male of Italian ancestry and is a former employee of defendant. Plaintiff began his career with defendant on May 7, 1966. Plaintiff's first position as an initial level supervisor with defendant began in 1975.

When plaintiff retired from defendant on January 3, 2002, he was an initial level supervisor. Plaintiff claims he was denied the opportunity to advance within the USPS after he filed his first EEO complaint in 1990, and that the only letters of warning plaintiff received were issued af-

---

1. The court construes the facts in the light most favorable to plaintiff as the non-moving party pursuant to Federal Rule of Civil Procedure 56. However, in some instances, plaintiff failed to cite to the record. In other instances, the record simply did not support plaintiff's factual contentions contained in his affidavit. The court will therefore exclude from this opinion those factual contentions which contain no support in the record. The court also excludes those factual contentions which are based on inadmissible hearsay. *Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir.2000) ("Hearsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment.").

ter he filed his EEO complaints. Defendant contends that plaintiff has offered no evidence other than his own speculative conclusions that his failure to advance was due to retaliation. Defendant further contends that plaintiff's failure to advance was due to his supervisor's opinion that he was a mediocre supervisor.

### 1. Plaintiff's EEO Activity

Throughout his career with defendant, plaintiff acquired a good familiarity with the EEO process and filed approximately 15 EEO complaints. Plaintiff has won EEO cases, settled EEO cases, and lost EEO cases against defendant. Plaintiff understood that as a USPS employee he was required to exhaust his administrative remedies before he could file a lawsuit in federal district court.

### a. Agency Case No. 1–I–642–1007–96

On January 24, 1996, plaintiff filed a formal EEO complaint of retaliation for his prior EEO activity, alleging that he was discriminated against when: (1) R.E. Miller, the Acting Manager of Distribution Operations and plaintiff's supervisor, criticized plaintiff's work and required plaintiff to provide medical documentation for absences on November 4, 5, and 8, 1995; (2) plaintiff was relieved of his duties as supervisor of his unit in 1995; and (3) on November 10, 1995, plaintiff was not utilized as Acting Manager, Distribution Operations (MDO).

Plaintiff had made a prior EEO complaint involving Miller, which was resolved in 1993. Plaintiff contends that he also had other EEO complaints regarding Miller's alleged retaliation against plaintiff.

### (1) November 4, 1995 Incident

On November 4, 1995, Miller was making his rounds as the acting MDO. Miller noticed that a considerable number of clogged discharge lights were lit on the Small Parcels and Bundles Sorter (SPBS) machine number one. Miller went to find plaintiff, who was the supervisor of the SPBS unit, to ask him why so many lights were on on the machine. When Miller found plaintiff and asked him that question, plaintiff stated that he "lets the employees run the unit." Plaintiff told Miller that the machine was not working because plaintiff had left it to his employees to fix on their own. Plaintiff contends that he was monitoring the unit and supervising the employees. The red lights are a warning that the machinery either needed to be shut down or that more help was needed.

When Miller asked plaintiff why he was allowing no mail to be worked on or processed for delivery, as the mail was instead going to the recycle bin for resorting, plaintiff stated that the employees would work it out. Miller asked plaintiff whether he was letting the employees determine when help was or was not needed, and plaintiff said "yes." Plaintiff claims that he told Miller that he needed more employees, which Miller refused. Miller told plaintiff to work it out amongst the employees in the unit and refused to provide more help. Plaintiff also contends that a clogged discharge means the machine had malfunctioned and that it was a maintenance problem. In that case, plaintiff would not be responsible for maintenance malfunction. Rather, it was Miller's job to coordinate repair maintenance.

Miller told plaintiff that when so much mail was going to the recycle bin, plaintiff should have stepped in. Plaintiff then told Miller that he was "stressed out" and was going home. Plaintiff testified that, during this exchange, he was not able to manage the unit, that he was very upset, and that he could not assume the responsibilities of his employees, so he left. Plaintiff contends that Miller criticized him out in front of the unit because Miller did not like

the way the unit was being run by plaintiff. Plaintiff considered Miller's style of management to be authoritarian and felt that Miller was vindictive against people that he did not like. Miller told plaintiff that he would have to bring in documentation that stated why he was not able to stay at work.

Miller disagrees with plaintiff's explanation regarding the problems involving the SPBS machine. Miller did not think that plaintiff assigned the employees under his control in the SPBS unit in the most efficient manner or that plaintiff properly directed the employees under his supervision while he was in charge of the SPBS unit. Miller contends that he allocated as many employees to the SPBS unit as he could and still maintain the other operations in the facility. In Miller's opinion, the number allocated to the SPBS unit was appropriate, although employees are sometimes absent for various reasons. Miller could not take other employees from other operations in the facility when SPBS employees were not present. Employees in the SPBS unit are specially trained for that machine, and not all employees had SPBS training. In addition, due to the collective bargaining agreement and the rights of employees based upon seniority, Miller could not simply move employees whenever or wherever needed. Miller stated in his affidavit that his decision as to how to allocate resources to managers had nothing to do with that manager's prior EEO activity.

Miller asked plaintiff to provide medical documentation for absences on November 4, 5, 8, 1995, which Miller was authorized to do under the terms and conditions of plaintiff's employment. Plaintiff provided the medical documentation. When asked how he was adversely impacted or harmed by Miller's request that he provide medical documentation for his absences, plaintiff testified that Miller would then become suspicious of plaintiff's ability to manage.

**(2) Plaintiff's Removal as Supervisor of the SPBS Unit**

Plaintiff alleges that Miller, plaintiff's supervisor in 1995, and Elizabeth Brown, the plant manager of the Kansas City Bulk Mail Center (BMC), retaliated against him when he was removed as supervisor of the SPBS unit in 1995.

Prior to plaintiff's removal as supervisor from the SPBS unit, there had been problems with the SPBS unit, including accident and productivity performance trends that defendant considered unacceptable. Plaintiff contends that the problems with the unit were not his, but were instead due to the inconsistency of any manager supervising the unit. Plaintiff claims he was brought in to correct problems, but that the situation in the SPBS unit was impossible to rectify because Miller would not provide the employees needed to run the unit. Defendant contends that Miller observed the problems during the time that plaintiff was supervisor, and it was plaintiff's performance that both he and Brown found unacceptable.

Defendant admits that there were problems with the productivity of the SPBS unit before plaintiff was assigned as supervisor. However, as is set forth above, Miller felt that plaintiff did not assign the employees under his control in the SPBS unit in the most efficient manner and that Miller allocated as many employees to the SPBS unit as he could and still maintain the other operations in the facility.

Brown talked to the employees in the SPBS unit to advise them that their unit's performance was unacceptable. Brown also asked employees why they thought the unit was in this state. One of the first concerns raised by the employees was the inconsistency of supervision.

Miller requested a meeting with Brown after she had met with the employees to discuss plaintiff's unsatisfactory performance and the actions that should be taken. Miller decided to replace plaintiff as supervisor of the SPBS, because he needed to determine if it was the supervisor or the employees who were the problem. Brown concurred with Miller's handling of the situation. Although removed as supervisor of the SPBS unit, plaintiff remained a supervisory level employee at the same pay rate.

### (3) Defendant's Failure to Use Plaintiff as Acting MDO

Plaintiff also alleges that Miller retaliated against him on November 10, 1995, for his prior EEO activity when Miller did not utilize plaintiff as Acting MDO, and instead utilized Rob Fox. Defendant claims that Miller could not have utilized plaintiff as Acting MDO that day because, although plaintiff was scheduled to work, plaintiff did not work that day. Plaintiff had submitted a request for leave pursuant to the Family Medical Leave Act (FMLA) so that he could take his wife to dialysis. Plaintiff contends that he was at work that day, but provides no facts or record support to controvert defendant's assertion that he was not present at work on November 10, 1995.

### b. Agency Case No. 1–I–661–0018–98

On September 1, 1998, plaintiff filed a formal complaint of retaliation for prior protected EEO activity, alleging that he was retaliated against when he found an August 28, 1996 e-mail from Stella Newsom to all managers, including Brown and Mark Scarborough, in a file on his worker's compensation claim. The e-mail explains the bases of one of plaintiff's EEO claims, why it was rejected and that it is beneficial to keep records.

Plaintiff claims that the August 28, 1996 e-mail encouraged managers to use documentation to defeat EEO complaints and caused him to be embarrassed, humiliated and singled out as a trouble maker. Plaintiff contends that, because the letter was in his file, his credibility was damaged and has potentially affected his ability to be promoted and to work in a management position.

Scarborough included a copy of Newsom's e-mail as an enclosure to a letter he wrote to Willie Welch at the Injury Compensation Office for the Mid–America District on June 18, 1998. Scarborough included the e-mail in response to plaintiff's contentions about the prior EEO claim in a submission he made regarding the worker's compensation claim. Plaintiff was not aware of the e-mail until he saw it in August 1998 in his worker's compensation file. Defendant points out that plaintiff's September 1, 1998 EEO complaint was filed based upon Scarborough's act of sending the e-mail to the Office of Workers Compensation Programs, not on Newsom's original sending of the e-mail. Other than speculation that his credibility has been damaged and that the e-mail has affected plaintiff's ability to be promoted, plaintiff has not alleged any actual harm as a result of the e-mail being in his file.

### c. Agency Case No. 1–I–642–0018–98

On July 10, 1998, plaintiff filed an EEO complaint alleging that he was retaliated against for prior protected EEO activity. Plaintiff claimed that Arieta Cole retaliated against him when she issued plaintiff a letter of warning on April 7, 1998, for failure to follow instructions after plaintiff failed to attend a mandatory training session on March 3, 1998. At that time, Cole was the Acting MDO and plaintiff's direct supervisor. When Cole issued the letter of warning to plaintiff, she was unaware that he had engaged in prior EEO activity. Although Miller's name is listed in the

area of the form stating "concurrence," Miller did not write or sign the letter of warning.

At the time, plaintiff had not submitted documentation to qualify for FMLA leave the day of the training session. Plaintiff claims that he had previously submitted documentation for FMLA leave due to his wife's dialysis, but that defendant lost the paperwork. In any event, defendant withdrew the letter of warning from plaintiff's file on July 1, 1998, after he submitted the required FMLA documentation.

#### d. Agency Case No. 1I–642–0003–01

On January 12, 2001, plaintiff filed an EEO complaint claiming that defendant retaliated against him for his prior EEO activity when: (1) on September 28, 2000, an allegedly hostile work environment was created by the MDO (Miller); and (2) on January 18, 2001, plaintiff was denied a work detail[2] in Florida that he had requested.

#### (1) September 28, 2000 E–Mail

On September 28, 2000, Miller was copied on an e-mail message from plaintiff concerning the changing of the location of the time card racks. Miller considered the tone of plaintiff's e-mail to be insubordinate. Miller responded to plaintiff's email and to Bruce King, plaintiff's direct supervisor at the time, that he did not like the tone of plaintiff's email. Miller also advised plaintiff that any concerns he had should be made through his supervisor. Miller did not take any disciplinary action against plaintiff for writing the e-mail, but did inform plaintiff, through his supervisor, that plaintiff's insubordinate actions would not be tolerated. Plaintiff contends that Miller's actions created a hostile work environment.

#### (2) Denial of Work Detail

In March 1999, Steven Wenzel replaced Brown as the plant manager of the BMC in Kansas City. Wenzel claims he did not know that plaintiff had engaged in any EEO activity prior to Wenzel's arrival at the Kansas City BMC in 1999, and that Wenzel did not make any decisions regarding plaintiff's work assignment based on plaintiff's prior EEO activity.

In January 2000, plaintiff found a detail position located in Fort Myers, Florida with John Luzzi that he wanted to take. Plaintiff told his direct supervisor, King, that Luzzi was going to contact him regarding plaintiff taking the detail. About three or four days before the detail was to begin, Luzzi e-mailed plaintiff that he needed to know for sure if he was coming. Plaintiff and Luzzi contacted Wenzel, who said he had sent the request to Ormer Rogers, the District Manager in Florida, and that if he didn't hear from Rogers, plaintiff was not going on the detail.

Plaintiff did not go on the detail. When plaintiff asked Wenzel why he did not get the detail, Wenzel told plaintiff he had not heard back from Rogers. Wenzel also told plaintiff that everybody who goes on a detail will have an individual development plan (IDP). Wenzel recalls that plaintiff attempted to negotiate his own detail outside of the BMC. Prior to Wenzel taking over as plant manager, details were commonly obtained by individual negotiation. However, Wenzel believed that detail assignments should be based on merit and career development; thus he changed the system for obtaining details. He also believed that the responsibility to identify and obtain details rested primarily with the subordinate managers and himself, the plant manager, not with individual employees. Wenzel informed plaintiff in a Janu-

---

**2.** From the record, the court believes a detail to be a work assignment.

ary 26, 2000 letter that he believed the best way to do this was to complete an IDP for each EAS [3] employee. Wenzel required plaintiff to have a career development plan and wrote to plaintiff on January 26, 2000, describing the requirements for the IDP.

Despite this requirement, defendant claims that Wenzel approved plaintiff's request and forwarded it to Rogers in Florida. Defendant claims that since Wenzel had not heard back from Rogers before the detail was to commence, plaintiff's request for the detail to Florida was not approved, and he was not allowed to go.

Plaintiff disputes that Wenzel ever approved the detail request. Plaintiff claims that Wenzel did not send the documents to Rogers, and that Wenzel did not want plaintiff to go on the detail due to plaintiff's prior EEO activity. However, plaintiff has pointed to no facts in the record to support his allegation that his prior EEO activity had anything to do with Wenzel's decision regarding this detail.

About nine or ten months after plaintiff was denied the Florida detail, Rob Fox, another employee, was sent on a different detail. Plaintiff asked Fox whether he had an IDP, and Fox told him that he did not. As a result, plaintiff decided to file an EEO complaint that he was retaliated against for not being allowed to go on a detail. Plaintiff also claims that he should have been chosen to go on the detail instead of Fox. At that time, plaintiff had his IDP in place, but Fox did not.

Defendant acknowledges that Wenzel did allow Fox to go on a detail to Florida in January, 2001. Fox did not have an IDP in place when Wenzel approved his request for a detail. Wenzel allowed Fox to go on the detail because he thought there was a benefit to the BMC, and be-

cause Brenda Marts from Headquarters had formally requested Fox for a detail to the Secondary Singulator Induction Unit (SSIU) program. The SSIU was a national program that the BMC was scheduled to receive and later did receive. Wenzel decided that Fox's participation in the SSIU detail would give the BMC a subject matter expert prior to their actual deployment of the program, and would be a benefit to the BMC.

Miller was not plaintiff's direct supervisor at that time, and Miller did not have any input into the decision to deny plaintiff the detail or to send Fox on the detail.

### 2. Plaintiff's Other Complaints in Support of His Retaliation and Hostile Environment Claims

### a. Letter of Warning from Geilsa Kennedy

On July 26, 1994, plaintiff received a letter of warning from Geilsa Kennedy because of plaintiff's poor work performance. Plaintiff contends that Kennedy wrote the letter so that he would not be promoted, and that an employee who had not filed an EEO complaint was given a promotion to a position that plaintiff was seeking. Kennedy claims that she issued the letter of warning because a report that plaintiff had filed about developing a standard operating procedure regarding the color code for the SPBS was late and unacceptable. After Kennedy returned the report to plaintiff to rewrite, plaintiff submitted a second incomplete and incorrect report. The report was returned to plaintiff a second time for correction, and he submitted another unsatisfactory report. The letter of warning did not result in any loss of position or pay for plaintiff. Moreover, Kennedy claims that she did not issue the

---

**3.** From the record, the court believes that EAS refers to supervisory level employees.

Plaintiff was either an EAS–15 or EAS–16 level employee at this time.

letter of warning in retaliation for plaintiff's previous exercise of his EEO rights.

### b. 1996 Medical Leave

In approximately 1996, plaintiff was on medical leave due to work-related injuries. Plaintiff contends that when he returned from his medical leave, Miller denied plaintiff a light duty position and placed him in a unit in which he had to sort through and lift heavy parcels. Defendant contends that it attempts to reasonably accommodate injured employees by attempting to find jobs, including light duty jobs, when appropriate. In 1996, Clem Felchle had the authority to make decisions regarding light duty, not Miller. Upon plaintiff's return to work, Miller assigned plaintiff to a unit which included supervision of the sack sorter, sack shakeout, and several mail runouts. As manager of the unit, plaintiff was not required to personally sort through damaged parcels; plaintiff could have assigned that task to one or more of the employees under his supervision.

### c. Failure to Use Plaintiff as the MDO

In August 2001, Felchle denied plaintiff the opportunity to act as the MDO. At the time that Felchle did not select plaintiff for the acting MDO position, Felchle was not was not aware of any prior EEO activity by plaintiff.

Moreover, although plaintiff was scheduled to work Saturdays and could have been selected to serve as acting MDO on Saturdays, from July 2000 until the time that he retired in 2001, defendant's records reflect that plaintiff was often absent on Saturdays because he was either on sick leave, FMLA leave or on annual leave. Defendant contends that actual physical presence at the facility was essential to serve as acting MDO because it is impossible to manage and supervise the operations of the facility without being in the

facility. The person selected to serve as acting MDO must set an example for the employees that he or she supervises, and defendant did not feel that plaintiff's frequent absences were a model for other employees. Despite those reservations, defendant permitted plaintiff to serve as acting MDO on September 22, 2000, September 29, 2000, October 20, 2000 and October 27, 2000.

### 3. Plaintiff's Complaint in this Case

On April 23, 2002, plaintiff commenced this action *pro se*. On his form complaint, plaintiff alleged that defendant failed to promote him, created unequal terms and conditions of employment, reduced his wages, and retaliated against him, resulting in hostile work conditions. Plaintiff did not mark the "termination of employment" box on the form complaint. Page three of plaintiff's complaint noted: "EEO participation—loss of position to act in higher level—loss of unit" as facts surrounding his claim of discrimination. On December 3, 2002, this court appointed counsel for plaintiff. On September 15, 2003, the court entered a scheduling order establishing October 3, 2003, as the deadline for amendments to the pleadings. Plaintiff did not amend his complaint to include a claim for constructive discharge.

In its Motion for Summary Judgment, defendant argues that: (1) the court lacks subject matter jurisdiction to consider claims (including a constructive discharge claim) for which plaintiff has not exhausted the required administrative remedies; and (2) it is entitled to summary judgment on plaintiff's claims that he was retaliated against for exercising his EEO rights, including plaintiff's claim that he was subjected to a retaliatory hostile work environment while he worked for defendant.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *see Adler,* 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler,* 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut," rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## III. Discussion

### A. Exhaustion of Administrative Remedies/Timeliness of Claims

Despite attaching to his complaint three administrative decisions with regard to four of his specific EEO filings in 1996, 1998, and 2001, plaintiff, in opposition to summary judgment, paints a picture of retaliatory action towards him for more than a ten-year period prior to his retirement in 2002. Defendant contends that plaintiff should be limited in this lawsuit to asserting as Title VII claims only the issues that defendant and the EEOC processed in the three decisions attached to plaintiff's complaint. The court addresses these procedural issues before turning to the substantive analysis of plaintiff's claims.

#### 1. Constructive Discharge Claim

Defendant contends that neither plaintiff's administrative claims nor his complaint include a constructive discharge claim, and thus plaintiff has not exhausted his administrative remedies with regard to a constructive discharge claim. Defendant also argues that plaintiff makes no allega-

tion that defendant in any way misled or actively deceived him in regard to his obligations, thus there is no basis to excuse plaintiff's failure to exhaust his administrative remedies on a constructive discharge claim.

As has previously been set forth in this Order, plaintiff's complaint attached two EEOC decisions that appealed defendant's final agency decisions on formal EEO complaints made by plaintiff on January 24, 1996, July 10, 1998 and September 1, 1998; and one final agency decision from defendant regarding a formal EEO complaint made by plaintiff on January 26, 2001. Neither those decisions, nor plaintiff's complaint, reference a constructive discharge claim.

During discovery in this case, plaintiff testified at his March 9, 2004, deposition that he was not discharged from defendant, but that he elected to retire. Plaintiff also testified that he did not want to retire but felt that he had no choice but to retire. Plaintiff testified that he did not want to do anything that was going to cause him to lose his retirement benefits. When asked during his deposition whether he had seen any document or had been told by defendant's management that if he was fired it would jeopardize his retirement benefits, plaintiff said that he thought he would lose everything if he was fired. Plaintiff also testified that he did not know of any specific examples of an employee losing their retirement benefits.

In the pretrial order, which was entered on July 2, 2004, and in opposition to defendant's Motion for Summary Judgment, plaintiff has argued that his hostile work environment claim encompasses a claim for constructive discharge, and that, therefore, it was not necessary to file a separate EEOC charge or make a separate claim for constructive discharge.

Defendant points out that plaintiff's complaint and the EEO decisions attached to his complaint do not mention constructive discharge, wrongful termination or any other similar claim. In fact, plaintiff's complaint alleges a hostile work environment in 1995, five years before he retired in 2001. Plaintiff did not file an EEO complaint alleging that he had been constructively discharged, and plaintiff did not claim during his deposition that he had been constructively discharged.

■■■ The court lacks jurisdiction to entertain a Title VII claim not previously filed with the EEOC. *Seymore v. Shawver & Sons, Inc.,* 111 F.3d 794, 799 (10th Cir. 1997). However, claims that are reasonably related to claims included in the EEOC charge may be asserted. *Harrell v. Spangler,* 957 F.Supp. 1215, 1219 (D.Kan.1997). The purpose of the exhaustion requirement is to provide notice of the alleged violation to the charged party and give the agency information which it needs to investigate and resolve the dispute between the employer and the employee. *Seymore,* 111 F.3d at 799.

■■■ In this case, plaintiff has provided the court with a copy of an October 14, 2001 letter that he wrote to defendant's manager of EEO Dispute Resolution, *after* defendant had completed its investigation of plaintiff's case number 1–I–642–0003–01. That case involved an allegedly retaliatory September 28, 2000, e-mail from Miller and defendant's denial of plaintiff's request for a work detail in Florida on January 18, 2001. In the October 14, 2001 letter, plaintiff stated: "I cannot continue my career under these continuing acts of reprisals. Thus, I am forced to retire under these conditions and will no longer be denied in my career goals." However, plaintiff did not retire until January 2002.

Plaintiff did not file a separate EEO complaint or EEOC charge claiming that he had been wrongfully terminated or constructively discharged. Plaintiff did not

provide defendant or the EEOC any opportunity to investigate and resolve the alleged forced retirement. Plaintiff did not include a wrongful termination or constructive discharge in his complaint in this case. Plaintiff did not claim during his deposition that he had been wrongfully terminated or constructively discharged. In fact, plaintiff did not raise a claim for wrongful termination or constructive discharge until the parties submitted the pretrial order in this case. Plaintiff has not, at any time, requested that he be permitted to amend his complaint to add a constructive discharge claim. In these circumstances, plaintiff has failed to exhaust his administrative remedies with regard to his constructive discharge claim. *See Martinez v. Potter,* 347 F.3d 1208, 1210–11 (10th Cir.2003) (upholding district court's grant of summary judgment on plaintiff's wrongful termination claim for similar reasons). Therefore, defendant is entitled to summary judgment on plaintiff's claim that his retirement in January 2002 was actually a constructive discharge.

### 2. Other Incidents of Alleged Retaliation

Defendant also argues that other allegations and claims of retaliation that plaintiff has asserted in the pretrial order and in his opposition to the Motion for Summary Judgment, namely the July 26, 1994 letter of warning from Geilsa Kennedy, the 1996 denial of a light duty position upon plaintiff's return from medical leave, and defendant's failure to use plaintiff as MDO in August 2001, are time-barred and exceed the permissible scope of the allegations in plaintiff's complaint because plaintiff did not exhaust his administrative remedies with regard to those allegations and claims before bringing this lawsuit.

Plaintiff contends that a hostile work environment claim can encompass acts that occur before, during, and after the administrative filing period for the claims alleged; thus, the court should consider all of plaintiff's allegations in analyzing plaintiff's hostile work environment claim, regardless of whether plaintiff filed separate administrative claims with regard to each discrete act that plaintiff has alleged in support of his claims in this lawsuit. Plaintiff does not claim to have filed administrative claims for each of these alleged acts of retaliation.

### a. Timeliness of Discrete Incidents of Alleged Retaliation

As the court noted above, exhaustion of administrative remedies is a prerequisite to instituting a Title VII action in federal court. *Seymore,* 111 F.3d at 799. When a retaliatory act occurs prior to the filing of a charge and the employee fails to allege the retaliatory act in the subsequent charge, the retaliatory act ordinarily will not be reasonably related to the charge. *Simms v. Okla. Ex rel. Dep't of Mental Health & Substance Abuse Servs.,* 165 F.3d 1321, 1322 (10th Cir.1999) (citing *Seymore,* 111 F.3d at 799). In this case, the charges of discrimination at issue were formally filed by plaintiff on January 24, 1996, July 10, 1998, September 1, 1998, and January 26, 2001. Thus, the retaliatory act that occurred before January 24, 1996—the July 26, 1994 letter of warning from Geilsa Kennedy—and which was not included in the subsequent EEO charges plaintiff filed, is not properly before this court. Plaintiff has failed to exhaust administrative remedies with respect to the July 26, 1994 letter of warning.

Moreover, based upon the Supreme Court's decision in *National Railroad Passenger Corporation v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), the court in this case concludes that each incident of alleged discrimination and each alleged retaliatory act constitute "discrete discriminatory acts." According-

ly, the 1996 denial of a light duty position upon plaintiff's return from medical leave, and defendant's failure to use plaintiff as MDO in August 2001, both of which plaintiff failed to include in any EEO charge, are untimely[4] and not properly before this court. *Id.* at 2073; *see also Davidson v. Am. Online, Inc.,* 337 F.3d 1179, 1186 (10th Cir.2003) ("[E]ach incident of discrimination constitutes a separate actionable unlawful employment practice."). Moreover, "application of this rule to incidents occurring after the filing of an EEO complaint is consistent with the policy goals of the statute." *Martinez,* 347 F.3d at 1211. Therefore, defendant is entitled to summary judgment with regard to plaintiff's claims that the July 26, 1994 letter of warning from Geilsa Kennedy, the 1996 denial of a light duty position upon plaintiff's return from medical leave, and defendant's failure to use plaintiff as MDO in August 2001 were separate acts of retaliation.

### b. Inclusion of Discrete Incidents of Alleged Retaliation In Support of Hostile Environment Claim

 With regard to plaintiff's claim that a hostile work environment claim can encompass acts that occur before, during, and after the administrative filing period for the claims alleged, the court defers to the Tenth Circuit's holding in *Martinez,* 347 F.3d 1208, that *Morgan* "does not negate the relevance of allegedly retaliatory incidents as to which administrative remedies have not been exhausted, when these incidents occurred after the filing of the judicial complaint." *Id.* at 1211. "Nor does the statute bar an employee from using prior acts as background evidence in support of a timely claim." *Morgan,* 536 U.S. at 113, 122 S.Ct. 2061; *see also Martinez,* 347 F.3d at 1210. Thus, even if the smallest portion of the alleged discriminatory conduct occurred within the limitations time period, then the court should consider all of the alleged discriminatory conduct in analyzing plaintiff's hostile environment claim.

Plaintiff claims he was subject to a hostile work environment both before and during the limitations period. Thus, the court will consider those acts which occurred within the entire time period of the alleged hostile environment, including the incidents specifically set forth in plaintiff's complaint, the July 26, 1994 letter of warning from Geilsa Kennedy, the 1996 denial of a light duty position upon plaintiff's return from medical leave, and defendant's failure to use plaintiff as MDO in August 2001, for purposes of determining liability under the hostile environment theory.

### B. The Substance of Plaintiff's Claims

Having determined the procedural parameters of plaintiff's claims, the court now turns to analysis of the substance of plaintiff's retaliation and hostile work environment claims.

---

4. A complainant must file a charge with the appropriate state or local agency, or have the EEOC refer the charge to that agency, within 240 days of the alleged discriminatory event to ensure that the claim may be filed with the EEOC within the 300–day limit set forth in Title VII. *E.E.O.C. v. Commercial Office Prods. Co.,* 486 U.S. 107, 110, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988); *Waller v. Consol. Freightways Corp.,* 767 F.Supp. 1548, 1558 (D.Kan. 1991). In a deferral state such as Kansas, a plaintiff must file Title VII discrimination charges within 300 days after the alleged discriminatory act occurred. 42 U.S.C. § 2000e–5(e)(1) (Title VII); 29 U.S.C. § 626(d)(2) (ADEA); *Peterson v. City of Wichita,* 888 F.2d 1307, 1308 (10th Cir.1989). The 300–day limit has passed with regard to each of plaintiff's additional claims of retaliation.

**1194**

## 1. Retaliation

To establish a prima facie case of retaliation, plaintiff must show that: (1) he engaged in protected opposition to discrimination; (2) defendant subjected him to an adverse employment action subsequent to the protected activity; and (3) a causal connection exists between the protected activity and the adverse employment action. *Pastran v. K–Mart Corp.*, 210 F.3d 1201, 1205 (10th Cir.2000). Once plaintiff establishes a prima facie case, the burden of production shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. If defendant presents evidence of a legitimate business reason, the plaintiff must then be allowed to demonstrate that the defendant's offered reasons are a mere pretext for discrimination. *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir.1996).

■ To engage in protected opposition to discrimination, plaintiff must have a reasonable good faith belief that he was opposing discrimination. *Zinn v. McKune*, 143 F.3d 1353, 1362 (10th Cir. 1998). However, a plaintiff's opposition could be protected even if he was wrong about whether the alleged conduct in fact violated Title VII; it is enough if plaintiff had a good faith belief that Title VII had been violated. *Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 385 (10th Cir.1984).

■ An employer must be aware that the employee has engaged in protected opposition in order to engage in retaliation. *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir.1993).

■ In this case, plaintiff has alleged seven separate acts or incidents of retaliation: (1) Miller's criticism of plaintiff's work and requiring plaintiff to provide medical documentation for absences on November 4, 5, and 8, 1995; (2) plaintiff being relieved of his duties as supervisor of the SPBS unit in 1995; (3) plaintiff not being utilized as acting MDO on November 10, 1995; (4) an August 28, 1996 e-mail from Newsom to all managers regarding one of plaintiff's EEO claims; (5) the April 7, 1998 letter of warning from Cole; (6) the September 28, 2000 e-mail from Miller, and (7) the January 18, 2001, denial of a work detail in Florida. Plaintiff has argued that he had a good faith belief that he was opposing discrimination when he made each of his EEO complaints, and that he believed the seven acts by defendant were retaliatory and were based on knowledge of his prior EEO activity. The court finds that plaintiff has met the first element of his prima facie case for each of these acts.

■ However, with regard to the second element of his prima facie case, the court concludes that plaintiff has failed to establish that he suffered any adverse employment action as a result of defendant's alleged retaliatory conduct. The Tenth Circuit takes a case-by-case approach to considering whether certain actions constitute adverse employment actions. *See Trujillo v. N.M. Dep't of Corr.*, 182 F.3d 933, 1999 WL 194151, at *2 (10th Cir.1999). Conduct will qualify as an adverse employment action if it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *see also Martinez*, 382 F.3d at 1071. However, "a mere inconvenience or an alteration of job responsibilities" is not an adverse employment action. *Sanchez v. Denver Pub. Schools*, 164 F.3d 527, 532 (10th Cir.1998) (citing *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)); *Martinez*, 382 F.3d at 1071.

█ The acts plaintiff contends were retaliatory, when considered either individually or in the aggregate, did not alter the terms or conditions of plaintiff's employment. Plaintiff has cited no adverse action that came of Miller criticizing his work and having him submit documentation for his absences in November 1995. Even when plaintiff was removed in 1995 as the supervisor of the SPBS unit, he remained a supervisory level employee at the BMC in Kansas City, with no reduction in pay or benefits. Despite the fact that plaintiff was not utilized as the Acting MDO on one specific occasion, the record reflects that defendant utilized plaintiff as Acting MDO on other occasions. Plaintiff remained a supervisory level employee with the same pay and benefits whether or not he was chosen to be the Acting MDO on a specific day. Plaintiff claims that he has been passed over for promotion opportunities because he engaged in EEO activity, but plaintiff has not cited facts in the record to support any specific instance in which he applied for a promotion which was denied by someone who was aware of his prior EEO activity. Plaintiff has not demonstrated any specific adverse action as a result of Newsom's August 26, 1998 e-mail or of Miller's September 28, 2000 e-mail. The April 7, 2000 letter of warning from Cole was removed from plaintiff's file after he provided appropriate documentation regarding the reason for his absence. Finally, the fact that plaintiff was denied the January 21, 2001 detail in Florida did not result in a significant change in his employment status—rather, plaintiff remained in his same position at the BMC in Kansas City.

Plaintiff's dislike for the choices defendant and its various supervisors made over the course of his career do not amount to adverse employment actions. The record simply does not reflect any adverse employment action toward plaintiff. Plaintiff relies primarily on speculation and conclusory assertions in claiming that he has experienced adverse employment action.

█ Moreover, plaintiff has established no causal link between his activities and the alleged retaliatory action. Plaintiff has failed to demonstrate that more than one of the supervisors he claims retaliated against him was even aware of his prior EEO activity at the time the alleged retaliation occurred. Plaintiff also has failed to controvert the assertions of each of defendant's supervisors that they did not base decisions about plaintiff's employment on his prior EEO activity. Rather, plaintiff rests his retaliation claim on the fact that he has made multiple EEO complaints over the course of his employment and on his speculative and unsupported assumptions that his prior EEO activity was the reason for any decision regarding his employment.

█ Regardless of an employee's participation in protected activity, he "may not simply hold [his] employer hostage by proclaiming that any adverse employment decision will be construed as discriminatorily motivated." *Hernandez v. McDonald's Corp.*, 975 F.Supp. 1418, 1427 (D.Kan.1997). Even where a plaintiff has established an inference of retaliatory motive based on timing, he still must "present ... direct evidence of retaliatory animus or circumstantial evidence which adequately demonstrates that an improper motive was a substantial motivation in the employer's decision." *Gonzagowski v. Widnall*, 115 F.3d 744, 749 (10th Cir.1997). Plaintiff has failed to establish a prima facie case that defendant subjected him to retaliatory harassment. Defendant is entitled to summary judgment on plaintiff's retaliation claim.

### C. Retaliatory Hostile Work Environment

Plaintiff also claims that he was subjected to a retaliatory hostile work environ-

ment based on his prior EEO activity. Defendant argues that plaintiff's hostile work environment claims fail as a matter of law.

Without addressing whether the Tenth Circuit recognizes a claim for a retaliatory hostile work environment based solely on plaintiff's prior EEO activity, such as plaintiff alleges here, the court notes that "[o]nly severe or pervasive workplace conduct that affects the terms, conditions, or privileges of employment are protected by Title VII." *Hounton v. Gallup Indep. Co.* 113 Fed.Appx. 329, 332, 2004 WL 2352109 (10th Cir.2004); *see also Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Even if the court considers the three additional incidents plaintiff has alleged in support of his hostile environment claim (the July 26, 1994 letter of warning from Geilsa Kennedy, the alleged denial of a light duty position upon plaintiff's return from medical leave in 1996, and defendant's failure to use plaintiff as MDO in August 2001), plaintiff has not demonstrated that he has experienced severe or pervasive workplace conduct that has affected the terms, conditions or privileges of his employment. Similarly, plaintiff has failed to create a genuine issue of fact that such alleged harassment was based on his prior EEO activity. Accordingly, defendant is entitled to summary judgment on plaintiff's hostile work environment claim.

**IT IS THEREFORE ORDERED** that defendant's Motion to Dismiss or in the Alternative for Summary Judgment (Doc. 45) is granted.